```
                                          ┌─────────────────────────────┐
                                          │ USDC SDNY                   │
                                          │ DOCUMENT                    │
                                          │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT              │ DOC #: _____      │
SOUTHERN DISTRICT OF NEW YORK             │ DATE FILED: Jan. 2, 2013    │
                                          └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
                                    :
                                    :    No. 11 Civ. 5382 (JFK)
IN RE WEBMD HEALTH CORP.            :
SECURITIES LITIGATION               :    **Opinion & Order**
                                    :
                                    :
------------------------------------X

APPEARANCES:

   For Lead Plaintiff The Michigan Funds:
   Andrew W. Robertson, Esq.
   Robin F. Zwerling, Esq.
   ZWERLING, SCHACHTER & ZWERLING, LLP

   For Defendants WebMD Health Corp., Wayne T. Gattinella,
   Anthony Vuolo, Martin Wygod:
   Alan S. Goudiss, Esq.
   H. Miriam Farber, Esq.
   Zina Al-Askari, Esq.
   SHEARMAN & STERLING LLP


**JOHN F. KEENAN, United States District Judge:**

     Lead Plaintiff Wayne County Employees' Retirement System

and Carpenters Pension Trust Fund-Detroit and Vicinity's

(collectively, "the Michigan Funds" or "Plaintiffs") bring this

putative securities fraud class action suit against WebMD Health

Corp. ("WebMD"), Martin J. Wygod ("Wygod"), Wayne T. Gattinella

("Gattinella"), and Anthony Vuolo ("Vuolo") (collectively,

"Defendants").  This proposed class action is brought on behalf

of all purchasers of securities issued by WebMD from February

23, 2011 to January 10, 2012 (the "Class Period").  In their

Consolidated Amended Complaint filed February 14, 2012 ("CAC" or

"Complaint"), Plaintiffs assert that WebMD and its officers violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

Defendants have moved to dismiss the Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and under Sections 101(b) and 102(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4(b), et seq.  For the reasons that follow, Defendants' motion is granted and the Complaint is dismissed without prejudice.

## I.    Background

Plaintiff Wayne County Employees' Retirement System purchased a total of 11,520 WebMD shares during the Class Period, all of which were sold on September 14, 2011 at $32.838 per share.  Plaintiff Detroit Carpenters purchased a total of 13,180 WebMD shares during the Class Period, and sold them on September 12, 2011 at $32.3311 per share.  According to Plaintiffs, the ultimate decrease in WebMD's share price during the Class Period was $31.75 per share, or 54.7%, although neither Wayne County nor Detroit Carpenters owned WebMD stock through the entire Class Period. (CAC ¶ 16; Certs. of Robert J. Grden & Richard G. Davis.)

Defendant WebMD provides health information services to consumers and healthcare professionals through public and private internet portals, mobile applications, and other

2

publications.  Defendant Wygod was WebMD's Chairman during the Class Period, Gattinella was its President and CEO, and Vuolo its CFO and COO. (CAC ¶¶ 23-26.)

WebMD generates most of its revenue (about 85% in 2010) from advertising on its public portals, which include www.webmd.com.  WebMD also has a private portals business, "an online health and management platform that employers and health plan providers use to provide information to and administer health benefits for their employees and plan participants." (Id. ¶ 36.)  Revenue from the private portals, which accounted for about 15% of WebMD's revenue in 2010, is generated through licensing agreements. (Id. ¶ 29.)

On February 23, 2011, the beginning of the proposed Class Period, WebMD issued a press release announcing financial results for the fourth quarter of fiscal year 2010 and expectations for 2011 revenue growth, and its officers participated in an earnings call.  The company also completed an offering of $400 million in convertible notes on March 14, 2011. (Id. ¶¶ 10, 71.)

WebMD issued a press release on April 12, 2011, stating that the company expected revenue for the quarter that ended March 31, 2011 to exceed analyst estimates; it also reaffirmed its financial guidance for 2011 and held another earnings call. On May 5, 2011, WebMD issued another press release and held an

3

earnings call, both of which reaffirmed the February 23 revenue projections. (Id. ¶¶ 72–74.)

About one month later, on June 7, 2011, Defendant Gattinella spoke at a conference, at which he restated WebMD's financial guidance and made generally optimistic remarks about the coming months. See Wayne Gattinella, Remarks at the Needham Internet & Digital Media Conference (June 7, 2011) ("Needham Remarks").  On July 18, however, WebMD issued a press release lowering its financial guidance for 2011.  Following this announcement, the price of WebMD shares fell about $14 to close at $32.48 per share, a 30% decline.  WebMD responded to this decline by issuing a press release after the close of business on July 18, in which Defendant Wygod reiterated his confidence in WebMD's prospects.  The next day, WebMD's stock price rose 13.58% to close at $36.89 per share. (Id. ¶¶ 82–83, 87–90.)

On August 2, 2011, WebMD released its quarterly results and reaffirmed its lowered guidance from July 18.  In a teleconference with analysts, Defendant Wygod stated his view that "we have a pretty good feel already on the second half of this year . . . .  We took a very careful look at this, and we're very comfortable with what we've put out there for this year." (WebMD Aug. 2, 2011 Earnings Call at 9).  The next day, WebMD's stock increased by about $4 to close up 12.41%. (CAC ¶ 101.)

WebMD released its third quarter results on November 2, 2011.  Revenue was $115 million, "at the low end" of WebMD's previously issued guidance.  The company also lowered its guidance for the fourth quarter and for all of 2011, noting two main causal factors.  First, services sold in the third quarter would not generate revenue until 2012, although some 2011 revenue had theretofore been expected.  Second, third quarter sales were — and fourth quarter sales were projected to be — less than predicted.  WebMD's stock price fell to $31.15, a loss of 7.70%. (Id. ¶¶ 108-16.)

On January 10, 2012 (the end of the Class Period), WebMD issued a press release stating (1) that it expected fourth quarter and full year 2011 earnings to be consistent with the November 2 guidance, albeit "between the low-end and midpoint"; and (2) that 2012 revenue would be lower than 2011 because of a more competitive market, and because WebMD's pharmaceutical clients would probably spend less money on marketing in anticipation of losing substantial revenue from major products going off-patent (the "patent cliff").  The January 10 press release also announced that Defendant Gattinella had resigned from his positions as WebMD's President and CEO, and as a member of its Board of Directors.  WebMD's stock closed that day down 28.53%. (Id. ¶¶ 117-19.)

## II.  Plaintiffs' Claims

The essence of Plaintiffs' claims is that throughout the Class Period, the Defendants knew of adverse developments relating both to WebMD's business and the pharmaceutical industry as a whole.  Plaintiffs allege that Defendants defrauded investors first by releasing revenue forecasts that Defendants knew to be inflated, and then by letting the truth about the bad state of WebMD's business trickle out over a series of months instead of all at once. (CAC ¶ 13.)

The specific developments that Plaintiffs refer to are as follows.  With respect to WebMD's public portals business, pharmaceutical companies "were taking an increasingly cautious approach to advertising," due to uncertainty regarding the FDA's position on pharmaceutical advertising. (CAC ¶ 4.)  Many pharmaceutical companies had also signed "corporate integrity agreements" with regulators, the consequence of which was lengthier internal review of all proposed advertising. Additionally, companies were curtailing advertising spending in the face of looming revenue loss, resulting from an estimated $100 billion worth of products going off-patent.  Pharmaceutical clients were allegedly decreasing or canceling their advertising on WebMD's website "because they were dissatisfied with the ROI" [return on investment]. (Id. ¶ 6.)  With respect to WebMD's private portals, Plaintiffs claim that this side of the business

6

suffered from declining enrollment "due to dissatisfaction with WebMD's services and a determination that they do not produce sufficient benefits to justify their cost." (Id. ¶ 7.)

Plaintiffs allege two reasons that Defendants concealed the true effects of these developments. (Id. ¶¶ 130, 132.)  First, Plaintiffs assert that Defendants "took advantage of the stock price inflation" in the course of completing a private placement of $400 million in convertible notes, which closed on March 14, 2011. (Id. ¶ 12.)  Second, Plaintiffs allege that Defendants were motivated to overvalue WebMD because of their efforts to sell the company. (Id. ¶ 144.) These efforts, which were not made public until the January 10, 2012 press release, began on July 29, 2011, and continued off and on until about January 10, 2012.

### III. Discussion

### A. Legal Standard

When considering a motion to dismiss, the Court treats all factual allegations in the Complaint as true, and draws all reasonable inferences in Plaintiffs' favor. See Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v. Bankers Trust Co., 166 F.3d 540 (2d Cir. 1999).  To survive the motion, the Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(internal quotation marks omitted).  Plaintiffs must show "more than a sheer possibility that a defendant has acted unlawfully" — they must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

Allegations of securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (2006) ("PSLRA"). See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).  Accordingly, "[t]he complaint must identify the statements plaintiff[s] assert[ ] were fraudulent and why, in plaintiff[s]' view they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001).  Moreover, because the Plaintiffs' claims arise under section 10(b) of the Securities Exchange Act and Rule 10b-5, they must allege that Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005).

### B.   Material Misstatements and Omissions

### 1.   Legal Standard

The Second Circuit has held that a complaint alleging a false statement must "state with particularity the specific facts in support of [Plaintiffs'] belief that [Defendants'] statements were false when made." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004).  A misstatement or omission is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  "Material facts include those that affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 162 (citing Basic, 485 U.S. at 231).

Moreover, the PSLRA provides that an issuer will not be liable for statements that fall under its safe harbor provisions. See 15 U.S.C. § 78u-5(c).  Specifically, when an action is based on an untrue statement of a material fact or

9

omission, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the statement is identified as forward-looking and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," (2) the statement is immaterial, or (3) the plaintiff fails to prove that the statement was "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B).  As the Second Circuit has noted, the safe harbor is written in the disjunctive, meaning that a defendant is not liable if any of these provisions apply. See Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).  Additionally, the judicially created "bespeaks caution" doctrine provides that "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com Inc., 295 F.3d 352, 357 (2d Cir. 2002).

### 2. Defendants' Statements Qualify as Forward Looking

Plaintiffs contend that many of the statements made in WebMD's press releases, guidance, and telephone conferences do not fall under the protections of the PSLRA's safe harbors or the "bespeaks caution" doctrine.  They argue that such

10

statements were not actually forward looking because they referred to facts then in existence.  Plaintiffs also claim that even the genuinely forward-looking statements still do not qualify for protection under the safe harbor because the cautionary language that Defendants provided was not meaningful, on the grounds that "disclosure of a laundry list of risk factors that 'may' or 'could' affect WEBMD's business . . . [did] not adequately communicate to investors the <u>specific risks</u> that <u>actually were</u> adversely affecting demand for the Company's products and services." (Pl. Br. at 25-26.)

As a threshold matter, the Court concludes that the examples cited in Plaintiffs' opposition brief or CAC, when taken in context, are forward looking.  At its core, a forward-looking statement is one that contains a projection of income or earnings, or one of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A), (C).  With respect to WebMD's public portals business, some of the contested statements are explicitly forward looking, such as:  "We don't expect that the impact from major drugs going off patent to be material to our revenues." (WebMD May 5, 2011 Earnings Call at 3, quoted in CAC ¶ 75.) When Defendants did make statements about current facts surrounding the public portals business, they were hardly misleadingly optimistic.  Some of these statements were demonstrably true, e.g., "[W]e're also now working with

companies that include Wal-Mart, Target and Nestle's Corporation." (WebMD Feb. 23, 2011 Earnings Call at 2, quoted in CAC ¶ 61.)  Others were notable for their candor, e.g., "[W]e have been seeing an increasing level of marketing conservatism on the part of big pharma . . . .  The consequence right now is a more cautious and longer approval cycle," (WebMD May 5, 2011 Earnings Call at 3, quoted in CAC ¶ 75) and "[T]here is a high level of conservatism or caution right now inside of many major pharmas." (Id. at 7, quoted in CAC ¶ 76.)  These remarks, oddly highlighted by Plaintiffs, do not show that Defendants falsified existing facts in their favor.  Instead, they display transparency about the facts on the ground at that time.  It certainly may be true that Defendants misinterpreted those circumstances as more temporary than they ultimately were.  But even if Defendants underestimated the effect on their year-long predictions and guidance, the Second Circuit does not permit pleading "fraud by hindsight." See, e.g., Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").

With respect to the private portals business, Plaintiffs chiefly take issue with Defendants' description of the sales environment for these services.  On February 23, 2011, Defendant

12

Gattinella stated that "we are beginning to see positive signs right now as our current pipeline of potential sales is much stronger than it was a year ago, both in terms of size and total number of deals."  In the May teleconference, Defendants reiterated this view.  Defendant Gattinella said that "we are beginning to see some positive signs in our sales trends as they are improving," and Defendant Wygod added that "we're starting to experience now the uptick in the sales perspective." Plaintiffs assert that these are false statements of existing fact, because "the private portals business was continuing to lose clients due to concerns about ROI." (Pl. Br. at 22) (emphasis omitted).

To the extent that Defendants were making any representations about the overall health of the private portals business, these statements are plainly forward looking.  Even taken out of context, words and phrases like "we are beginning to see signs," "trends," and "current pipeline of potential sales" convey rather clearly that the speaker is using current facts only to describe an expectation for the future. See Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future

13

projection of which they are a part.'" (quoting Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009))). This is especially true given that in WebMD's private portals business, "new sales activity typically takes place in the beginning of the calendar year, and ultimately would implement towards the end of the calendar year at the end of the year." (WebMD May 5, 2011 Earnings Call at 7.) Speaking as they were during the first half of the year, Defendants projected from the volume of sales activity they saw that the private portals business would reap greater success than was ultimately realized.

Even if one reads clauses within these statements as referring to currently existing facts — i.e., "we are beginning to see signs . . ." — Plaintiffs' allegations of falsehood are conclusory and fail to "state with particularity the specific facts in support of [Plaintiffs'] belief that [Defendants'] statements were false when made." Rombach, 355 F.3d at 172. The Complaint's main support is a November 4, 2010 report by "Chilmark Research" discussing WebMD's "lackluster" private portals business and summarizing the author's conversation with an unnamed source at Blue Cross Blue Shield of Massachusetts. But this report does not support Plaintiffs' allegation that Defendants were not beginning to see signs of potential improvement in the private portals business, as they claimed.

14

Other portions of the Complaint to which Plaintiffs look for support are similarly unavailing.  Paragraph 50 simply states that the private portals business had lost customers, a fact Defendants disclosed in their filings. See WebMD 10-K of March 1, 2011 at 73; WebMD 10-Q of August 9, 2011 at 42. Paragraph 51 summarizes the findings of the Chilmark report. And Paragraph 57 combines conclusory, unsupported allegations ("Defendants knew . . . the Company would be unable to offset client losses with new client additions") with facts that Defendants had themselves disclosed throughout the Class Period. Compare CAC ¶ 57(c) ("the lengthy sales and implementation cycle for new private portal programs and services would prevent the Company from recognizing significant revenues from new sales during 2011"), with WebMD Feb. 23, 2011 Earnings Call at 7 ("A lot of the new sales activity typically takes place in the beginning of the calendar year, and ultimately would implement towards the end of the calendar year, which — hence the revenue that we would accrue from those new programs would not really be seen until the following calendar year.").

To summarize, Defendants' statements cited by Plaintiffs are forward looking, and thus warrant a safe harbor analysis. With respect to those portions of Defendants' statements that contain references to existing fact, Plaintiffs have failed to

plead with particularity that such references were false or misleading.

### 3.    The Safe Harbor Protects Defendants' Statements

Defendants will not be liable as a matter of law for any forward-looking statements if the statements are identified as forward looking and accompanied by meaningful cautionary language; or, alternatively, if Plaintiffs fail to prove that the statement was made with actual knowledge that it was false or misleading.[1]  The Court concludes that Plaintiffs have not proven actual knowledge, and so the safe harbor shields Defendants from liability.

### a.    Plaintiffs Have Not Shown that Defendants Had Actual Knowledge of the Statements' Falsity

The "actual knowledge" safe harbor prong requires that Plaintiffs "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)).  The Court must accept all factual allegations in the Complaint as true. Tellabs, 551 U.S. at 322.  However, these facts must support a strong inference of scienter, one that is

---

[1] Defendants do not contend that the second safe harbor, immateriality, applies.  Accordingly, it is not discussed here.

not just "merely plausible or reasonable" but "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 319.  In evaluating forward-looking statements (as opposed to statements of current fact), a inference of mere recklessness is not enough; indeed, "it must be placed on the nonculpable-explanation side of the balance when we weigh competing inferences." Avaya, Inc., 564 F.3d at 274; see also Slayton, 604 F.3d at 776 n.9 ("We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness — an objective inquiry — they must show actual subjective knowledge.").

As explained at length in the scienter analysis below, Plaintiffs have failed to plead sufficient facts to support a strong inference of scienter.  A reasonable person would not "deem an inference that the defendants (1) did not genuinely believe the [forward-looking statements], (2) actually knew that they had no reasonable basis for making the statement[s], or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement[s], 'cogent and at least as compelling as any opposing inference.'" Slayton, 604 F.3d at 775 (quoting Tellabs, 551 U.S. at 323; Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989)).  As such, the "actual knowledge" safe harbor precludes liability.

17

### b.    Meaningful Cautionary Language

Because Defendants qualify for protection under the "actual knowledge" prong of the safe harbor, the question whether they also qualify under the "meaningful cautionary language" prong is moot. See Slayton, 604 F.3d at 766 (noting that "[t]he safe harbor is written in the disjunctive"); Gissin, 739 F. Supp. 2d at 511 n.144.  The Court nevertheless notes that the Complaint is alternatively subject to dismissal on the grounds that Defendants are protected by their cautionary language throughout the Class Period.

The "meaningful cautionary language" provision protects Defendants where the purported false or misleading statement is identified as forward looking and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." 15 U.S.C. § 78u–5(c)(1)(A)(i).  "[B]oilerplate warnings will not suffice," H.R. Conf. Rep. 104–369, at 43 (1995), as reprinted in 1995 U.S.C.C.A.N. 730, 742 ("Conference Report"), nor will words of caution about future risk if in fact the risk has already transpired, see Slayton, 604 F.3d at 770 & n.5 (citations omitted).  However, "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected." Id. (citing Conference Report at 44,

18

1995 U.S.C.C.A.N. at 743).  Ultimately, the question is whether "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." Halperin, 295 F.3d at 359.

Plaintiffs argue that Defendants' cautionary language throughout the Class Period was not meaningful for several reasons.  They first point to the fact that many of the cautionary statements were only made after the February 23 press release and earnings call, and thus assert that "[t]hese subsequently made statements did not 'accompany' Defendants' revenue projections . . . and so could not have protected investors from being misled." (Pl. Br. at 25.)

Although the February 23, 2011 press release does not contain an extended discussion of risk factors, it does include a general paragraph advising of "risks and uncertainties," and refers the reader to WebMD's SEC filings.  Turning to the SEC filing immediately prior to the February 23 press release, WebMD's 10-Q filed on November 9, 2010, the extensive cautionary language contained in the section entitled "Factors That May Affect Our Future Financial Condition or Results of Operations" is more than sufficient to put an investor, even one trading on February 23, on notice that "actual results [might] differ materially from those in the forward-looking statement." 15

U.S.C. § 78u-5(c)(1)(A)(i); see WebMD 10-Q of Nov. 9, 2010 at 44-58.

Specifically, Plaintiffs claim that Defendants deliberately concealed advertisers' increasing reticence, which purportedly resulted from shrinking advertising budgets, uncertainty regarding the FDA's position on internet pharmaceutical advertising, and concern about ROI.  But WebMD's 10-Q specifically cites "regulatory changes affecting advertising and promotion of drugs" as an unpredictable factor that could affect revenue. (WebMD 10-Q of Nov. 9, 2010 at 46; see also id. at 51 (section entitled "Risks Related to the Healthcare Industry, Healthcare Regulation and Internet Regulation"); 53 ("Our advertising and sponsorship revenue could be materially reduced by additional restrictions on the advertising of prescription drugs and medical devices to consumers, whether imposed by law or regulation or required under policies adopted by industry members.").)  With respect to consumer product company advertising, the 10-Q states plainly that "we cannot assure you that . . . advertisers and sponsors will find our consumer Websites to be as effective as other Websites or traditional media for promoting their products and services." (Id. at 47.)

Turning to the private portals business, Plaintiffs allege that Defendants misled investors by concealing the fact that clients were dissatisfied with the service and its ROI.  WebMD's

20

10-Q addresses the risk factors relating to its private portals business in detail, first listing its various competitors. (Id. at 45.)  It also explains the sales and implementation cycles for the private portals, and the potential for delay and unpredictability inherent in those cycles. (Id. at 47.) Finally, WebMD notes that the health of its private portals division is dependent upon "increasing usage of our private portal services by our employer and health plan clients' employees and members and being able to demonstrate a sufficient return on investment and other benefits . . . .  if we are unable to do so, we may experience static or diminished usage." (Id. at 48.)  No reasonable investor could claim to have been ignorant of these risks; the 10-Q risk factors "relate directly to that by which the plaintiffs claim to have been misled." Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998).

It is true that Defendants did not mention the impending patent cliff until the May 5 earnings call, when Defendant Gattinella commented:  "We don't expect that the impact from major drugs going off patent to be material to our revenue. However, we are monitoring how managed care might encourage therapeutic substitutions and the impact that could have on marketing expenditures for those related brands." (WebMD May 5, 2011 Earnings Call at 3.)  Although forward looking, this

statement does little to warn investors that "actual results [could] depart from the projection" — i.e., that pharmaceutical companies would compensate for lost revenue from newly off-patent drugs by shrinking advertising for other products. In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (citing Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004)).

The Court nevertheless concludes that the "meaningful cautionary language" provision of the safe harbor is applicable here.  Defendants were not obligated to predict correctly "the particular factor that ultimately causes [their] projection not to come true" — here, the effect of the patent cliff on pharmaceutical company marketing expenditures. Slayton, 604 F.3d at 770 (citing Conference Report at 44, 1995 U.S.C.C.A.N. at 743).  As stated before, the question is instead whether "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." Halperin, 295 F.3d at 359.  In this case, the Court finds that such an investor could not have been so misled by WebMD's silence regarding the patent cliff.  The existence of the patent cliff was publicly available common knowledge.  And Gattinella's prediction, while ultimately erroneous, could not have misled a reasonable investor into thinking that there was no risk.

Plaintiffs also argue that the cautionary language throughout the Class Period was not meaningful because it did not "adequately communicate to investors the specific risks that actually were adversely affecting demand for the Company's product and services." (Pl. Br. at 25–26.)  While it is true that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired," Rombach, 353 F.3d at 173, this does not exempt Plaintiffs from the pleading requirements.  They still must plead factual content, rather than "mere conclusory statements." Iqbal, 556 U.S. at 678.  Plaintiffs have not met this obligation.  The sections of the Complaint that they cite consist largely of conclusions (such as the charge that advertisers "determined that WebMD's sponsorship programs do not produce returns to justify their cost," CAC ¶ 48), many of which are themselves supported by conclusions, see id. ¶ 56 ("Defendants also knew by February 23, 2011 that demand for public portal advertising programs would be adversely affected . . . .").  Where facts are asserted, they are either (1) recitations of facts or observations that were public and thus available to investors, see id. ¶ 52 (the Chilmark Research report); or (2) facts that were adequately discussed by Defendants, compare id. ¶ 43 (noting that pharmaceutical companies' corporate integrity agreements imposed "heightened requirements for the companies'

23

internal oversight and approval of promotional activities"), and Pl. Br. at 26 (same), with WebMD May 5, 2011 Earnings Call at 3 ("[W]e have been seeing an increasing level of marketing conservatism on the part of big pharma, particularly among companies that are subject to corporate integrity agreements with the government.  The consequence right now is a more cautious and longer approval cycle from their internal medical and legal staff . . . .").

The exception is Plaintiff's use of an internet article from www.WorldofDTCMarketing.com dated August 2011, which purportedly quotes anonymous pharmaceutical executives criticizing WebMD for insufficient ROI. (CAC ¶ 48.)  But this article by itself is insufficient to bear the weight of factually supporting Plaintiffs' allegations.  To say that WebMD's clients were "concerned about ROI" is a deceptively broad claim — indeed, one that presumably affects almost every company.  To argue that WebMD investors were unaware of such an omnipresent risk, the generalized possibility that its clients might cease to find value in its services, is not plausible.

To be sure, not all of the statements offered by Defendants constitute "cautionary language" within the meaning of the safe harbor. See, e.g., WebMD Feb. 23, 2011 Earnings Call at 11. Plaintiffs correctly point out that these remarks, when viewed in context, do not serve to advise investors that WebMD's

24

ultimate revenues could differ from projections, but instead merely explain why the projections were not higher. (Pl. Br. at 26-29.)  Nevertheless, for the reasons discussed above, there remains sufficient meaningful cautionary language, particularly in WebMD's SEC filings, to qualify for the safe harbor.

### 4.    Materiality

Even if Defendants were not protected under the PSLRA safe harbor, Plaintiffs have not satisfied their burden of pleading misstatements or omissions of a material fact.  As discussed above, Plaintiffs must "identify the statements plaintiff[s] assert[ ] were fraudulent and why, in plaintiff[s]' view they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp., 252 F.3d at 69-70. "Moreover, it bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (citing 17 CFR § 240.10b-5(b); Basic, 485 U.S. at 239 n.17).  Plaintiffs have met their burden as to materiality if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information

25

made available." Id. at 1318 (internal quotations and citations omitted).

In their brief, Plaintiffs point to several statements made by Defendants during the Class Period, and assert that these statements misrepresented the "customer demand for WebMD's products and services." (Pl. Br. at 21–22.)  But Plaintiffs fail to show cognizably diminished demand from the beginning of the Class Period.  Both WebMD's private and public portals revenues historically were strongest at the end of the calendar year — thus, the statements in WebMD's February 23, 2011 press release appear to properly reflect a reasonable (if ultimately too optimistic) projection for the year to come.[2]

When asked at oral argument for evidence to support its allegations about customer demand, Plaintiffs' counsel claimed that his position is "based on the timing of the events that impacted the business." (Nov. 8, 2012 Tr. at 16.)  Specifically, he claimed that Defendants made material misstatements when they

---

[2] Although Plaintiffs assert that there is a contradiction between WebMD's loss of clients at the end of 2010 and Defendants' touting a strong pipeline of potential sales in February 2011, it is more plausible that these statements are completely consistent.  Given that the sales and implementation cycle for this business was almost a year long, the fact that Defendants saw sales potential that was "much stronger" in February 2011 made it reasonable for them to expect that at the end of the cycle, the private portals business would have improved.  Defendants' simple explanation for the eventual shortfall — "stronger sales activity in the earlier part of the year . . . did not translate into the number of new customer implementations as we had expected" — is more plausible than Plaintiffs' theory. (WebMD Aug. 2, 2011 Earnings Call at 5.)

predicted a strong year for WebMD's public portals business despite knowing that many of its pharmaceutical customers had executed corporate integrity agreements with the government. (Id.)  But as noted earlier, Defendants discussed these agreements on at least one investor call, so there can be no allegation of a material omission. See WebMD May 5, 2011 Earnings Call at 3.

Plaintiffs' position is instead that the Defendants materially misstated their guidance because factors such as the integrity agreements eventually contributed to lower revenues. But as the Second Circuit has stated, "Corporate officials need not be clairvoyant . . . . allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Novak, 216 F.3d at 309 (citations omitted).  Because Plaintiffs have not demonstrated that Defendants' statements were false when made, their materiality argument fails.

### C. Scienter

As mentioned earlier, Plaintiffs fail to meet their burden with respect to scienter.  To survive a motion to dismiss, a securities fraud claim like Plaintiffs' must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, "'an

27

intent to deceive, manipulate, or defraud.'" 15 U.S.C. § 78u-4(b)(2); Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co., 445 F. App'x 368, 369 (2d Cir. 2011) (quoting Ernst & Ernst, 425 U.S. at 191 n.7).  This may be done by alleging facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Ganino, 228 F.3d at 168–69).   With respect to whether Plaintiffs have successfully raised a "strong inference" of scienter, "the ultimate inquiry is:  'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" Meridian Horizon Fund, LP v. KPMG (Cayman), Nos. 11-3311-cv, 11-3725-cv, 2012 WL 2754933 at *2 (2d Cir. July 10, 2012) (quoting Tellabs, 551 U.S. at 326).

In this case, Plaintiffs assert that they have established a strong inference of scienter "through allegations that Defendants knew their statements were false and misleading." (Pl. Br. at 14.)  In support of this contention, they again point to adverse business conditions that purportedly existed through the Class Period, namely pharmaceutical companies' reticence to invest in advertising because of pending FDA guidance, more rigorous internal review, budget cuts due to the

28

impending "patent cliff," and doubts about ROI.  Plaintiffs further allege that Defendants were aware of these developments throughout the Class Period, including when the February 23, 2011 guidance was issued.

It is true that these conditions were at least contemplated by WebMD.  Their 10-Q filed on November 9, 2010 — the last filing before the beginning of the Class Period — lists risk factors including the "intensely competitive" healthcare information market (WebMD 10-Q of Nov. 9, 2010 at 45), FDA regulation of drug advertising (id. at 52–53), and the unpredictability of advertising revenues due to advertisers' internal review processes (id. at 46; see also WebMD 10-Q of May 10, 2011 at 44 ("Recently, we have seen a trend toward the lengthening of this internal review process as it applies to our services for pharmaceutical companies.")).  Additionally, during the May 5, 2011 earnings call, Defendants mentioned "marketing conservatism" by pharmaceutical companies as well as the patent cliff situation. (WebMD May 5, 2011 Earnings Call at 3; see also Needham Remarks at 8 (discussing the patent cliff at greater length)).

But there is a missing link between Defendants' cognizance of potentially adverse business conditions and Plaintiffs' accusation that the statements and projections were not simply too optimistic but actually false and made with "an intent to

29

deceive, manipulate, or defraud." Ernst & Ernst, 425 U.S. at 191 n.7.  In the absence of any compelling and specific showing by Plaintiffs, it is far more plausible that Defendants were not deceitful but mistaken.

For example, Defendant Gattinella stated on June 7, 2011 that he expected the impact of major pharmaceutical products going off patent to be "pretty de minimis" to WebMD because WebMD derived only about 2% of its revenue from advertising those products, and because many new "specialty" drugs would be better fits for advertising on WebMD. (Needham Remarks at 8 ("[M]uch of the new innovation in research and development has been more targeted in specific disease states . . . .  areas that are actually more of our sweet spot. . . .  [W]e actually feel pretty positive about that dynamic."))  Even after WebMD had lowered its yearly guidance, on August 2, 2011, he reiterated this position (WebMD Aug. 2, 2011 Earnings Call at 8), as did Defendant Wygod, who stated that WebMD stood to gain from the major changes in the pharmaceutical landscape, because "[a]s blockbuster products lose patent exclusivity and more specialized products come to market, pharma companies must adopt this new approach to marketing and leverage the competitive advantages offered through the new digital framework," (id. at 5; see also WebMD Nov. 2, 2011 Earnings Call at 9 (Defendant Gattinella reasserting this view).)  On January 10, 2012,

30

however, WebMD's press release indicated that "[t]he loss of patent exclusivity is not only impacting the marketing expenditures related to the products facing the loss of patent protection, but it is also having a greater than previously anticipated impact on marketing expenditures across entire product portfolios of some pharmaceutical companies."

Thus, the Court concludes that the more plausible explanation of Defendants' statements is that they misread their situation.  They believed that the loss of patent protection for big drugs would not hurt WebMD, since those drugs were not advertised on WebMD all that much.  But Defendants did not realize that declining revenues would cause pharmaceutical companies to cut advertising budgets across the board.  The alternative explanation — that Defendants knew all along how the patent cliff would affect WebMD but hid that information even after revising their guidance downward repeatedly — is not persuasive.

Nor do other factors in this case suggest a strong inference of scienter.  For example, WebMD's private portals guidance was fairly conservative; even at its most optimistic, WebMD predicted "essentially flat" revenues for 2011. (Press Release, WebMD, WebMD Announces Fourth Quarter Financial Results (Feb. 23, 2011).)  That Defendants repeatedly adjusted the

31

revenue guidance as the year progressed further evinces a nonfraudulent intent.

Plaintiffs' alternative scienter argument is that the Defendants had a motive to commit fraud, which "contributes to an inference of scienter."  This is similarly unconvincing. Plaintiffs first point to the convertible note offering completed on March 14, 2011, stating that the offering was a motive for fraud because a high stock price "increased the price investors were willing to pay for the convertible notes, thereby increasing the proceeds to WebMD from the offering and reducing the dilutive effect." (Pl. Br. at 13-14.)  But this is insufficient to show a fraudulent motive, which "is generally demonstrated through allegations of insider trading or some other type of pecuniary gain by company insiders at the expense of shareholders," Kalnit v. Eichler, 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000), aff'd, 264 F.3d 131 (2d Cir. 2001), or at least "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," Shields, 25 F.3d at 1130.  By constrast, the Second Circuit has stated that the "motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but does not 'entail corporate benefits.'" Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (citing San Leandro, 75 F.3d at 813-14;  Acito v. IMCERA Grp., Inc., 47 F.3d

47, 54 (2d Cir. 1995)).  In this case, Plaintiffs have shown no benefit to the individual Defendants as a result of the note offering, and only a general, non-actionable benefit to WebMD.[3]

Moreover, WebMD used some of the proceeds from the offering to buy back over 800,000 shares of its own stock.  Defendants argue that "[i]t would defy economic reason to believe that WebMD was motivated to commit fraud so that it could raise funds to repurchase its own stock at an artificially inflated price." (Rep. Br. at 12.)  The burden is on Plaintiffs to show how these transactions qualify as a motive to deceive, which they have attempted to satisfy by pointing out that the buyback cost only about $50 million out of $387 million raised in the offering. They further urge that the circumstances in this case — specifically, the fact that the February 23, 2011 guidance was followed by the convertible note offering on March 14, 2011 — are sufficient to show scienter.  The Court cannot agree that this timeline, in the absence of more damning evidence, establishes much of anything.

Plaintiffs' allegation that Defendants were motivated to deceive the market because of a potential sale of WebMD are

---

[3] On this point, Plaintiffs' reliance on In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620 (E.D. Va. 2000), is misplaced.  The court in that case did infer scienter from alleged fraud in connection with a public offering.  But that case involved allegations of falsified statements and insider trading by individual Defendants on a large scale — specific and concrete allegations elements that are missing from the instant case.

likewise unpersuasive.  At the outset, it bears mentioning that by the time Defendants began to seek a purchaser for WebMD, on July 29, 2011, WebMD had already lowered its revenue guidance for the rest of the year on July 18, triggering a significant drop in the stock price.  WebMD disclosed this disappointing update several weeks in advance of the release of its second quarter results, on August 2.  Nevertheless, Plaintiffs argue that the individual Defendants were motivated to get a higher price for WebMD from private equity purchasers and to "retain their positions as senior executives following an acquisition of" WebMD. (Pl. Br. at 16–17.)  Courts have routinely rejected both of these motives as insufficient to give rise to a strong inference of scienter. See, e.g., Shields, 25 F.3d at 1130 ("If motive could be pleaded by alleging the defendant's desire for continued employment, and opportunity by alleging the defendant's authority to speak for the company, the required showing of motive and opportunity would be no realistic check on aspersions of fraud, and mere misguided optimism would become actionable under the securities laws."); Leventhal v. Tow, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (rejecting inference of scienter where plaintiffs alleged that officers inflated the company stock price to "'protect and enhance their executive positions'"); see also Phillips v. LCI Intern, Inc., 190 F.3d 609, 623 (4th Cir. 1999).

34

In sum, it is conceivable that Defendants intentionally misled investors starting on February 23, 2011 about WebMD's earnings prospects.  But Tellabs requires that "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. The accusations in the Complaint do not rise to this level, and thus Plaintiffs have failed to meet their burden with respect to scienter.

### D.  Reliance

Defendants also move to dismiss the Complaint on the ground that Plaintiffs did not explicitly allege that the market for WebMD's stock was efficient.  This contention is without merit; nevertheless, the Complaint remains subject to dismissal on the other grounds set forth in this Opinion.

In a securities class action arising under section 10(b) of the Securities Exchange Act and Rule 10b-5, the reliance element of the securities fraud claim may be presumed using the fraud-on-the-market doctrine where the market for the securities is efficient — that is, open and developed. See In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 510 (2d Cir. 2010) (citing Basic, 485 U.S. at 241–42).

Although the Complaint in this case does not use the phrase "efficient market," it does state that WebMD's stock is publicly

35

traded on the NASDAQ, with the number of shares outstanding in the tens of millions.  "'[T]he question on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one.'" In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005) (quoting Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992)).  Plaintiffs have clearly met this burden.  The Court therefore concludes that, although it is deficient in several other respects, the Complaint adequately pleads reliance.

### E.  Plaintiffs' Section 20(a) Claims

A "control person" may be held liable for another's violation of the securities laws if a plaintiff shows:  "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the [controlling person] was in some meaningful sense a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc., 493 F.3d at 108.  Because the Complaint fails to state a Section 10(b) claim, Plaintiffs' claims for control person liability under section 20(a) must also be dismissed.

### F.  Leave to Replead

Under the Federal Rules of Civil Procedure, a district court must "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2).  This Court "has discretion to deny leave for good reason, including futility,

36

bad faith, undue delay, or undue prejudice to the opposing party." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted). However, Defendants have not made an adequate showing that there is "good reason" to deny leave to amend. Therefore, the Court dismisses the Complaint without prejudice.

### IV.  Conclusion

Because Plaintiffs have failed to prove that Defendants made forward-looking statements with actual knowledge of their falsity, and because Plaintiffs have also failed to meet their heightened burden of adequately pleading materiality and scienter, Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims is granted.

Additionally, because the validity of a Section 20(a) claim against a "controlling person" depends on the existence of a valid claim against the allegedly controlled person, and because Plaintiffs have failed to state a claim against WebMD, the motion to dismiss Plaintiffs' Section 20(a) claims is granted.

37

Plaintiffs are granted sixty (60) days from the date of this Opinion & Order to file a Second Amended Complaint. Defendants shall answer or otherwise respond to Plaintiffs' Amended Complaint, if filed, within forty-five (45) days of being served with the Second Amended Complaint.

**SO ORDERED.**

Dated:     New York, New York
           January 2 , 2013

John F. Keenan
JOHN F. KEENAN
United States District Judge